**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

RANDY DEETS,

    Plaintiff,

vs.

RUDY CASTILLO, et al.,

    Defendants.

3:08-cv-00655-RCJ (RAM)

**REPORT AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE**

This Report and Recommendation is made to the Honorable Robert C. Jones, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Defendants' Motion for Summary Judgment. (Doc. # 59.)[1] No Opposition has been filed. After a thorough review, the court recommends that Defendants' motion be granted.

## I. BACKGROUND

At all relevant times, Plaintiff Randy Deets (Plaintiff) was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Am. Compl. (Doc. # 43).) The events giving rise to this action took place at Nevada State Prison (NSP), Northern Nevada Correctional Center (NNCC), and Lovelock Correctional Center (LCC). (*Id.*) Plaintiff, a *pro se* litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*)

Plaintiff's original Complaint was filed on April 7, 2009. (Doc. # 5.) On screening, the court allowed his Eighth Amendment excessive force claim to proceed against Mr. Castillo. (Doc. # 4.) Plaintiff's Amended Complaint (verified) was filed on October 27, 2010. (Doc. # 43.)

---

[1] Refers to the court's docket number.

Defendants are Rudy Castillo, Dr. John Scott, and Dr. Delmar Snider (collectively, Defendants). (Screening Order (Doc. # 42).) Pursuant to the court's Screening Order, the only remaining claims are: the claim for negligence against Castillo in Count I; the Eighth Amendment medical claims in Counts II, III, IV, and V; and the First Amendment retaliation claims in Counts II, III, and IV. (*Id.*)

In Count I, Plaintiff sets forth a claim for negligence against Castillo related to an incident occurring on August 3, 2008, when he was crushed by a gate at NSP. (Doc. # 43 at 5, 7.)

In Counts II, III, IV, and V, Plaintiff alleges claims of deliberate indifference to serious medical needs in violation of the Eighth Amendment. (Doc. # 43 at 5, 8-12.) In Count II, he asserts that Dr. Snider, and possibly Doe NNCC medical personnel, denied him his asthma medications at NNCC. (Doc. # 43 at 5, 8-9.) In Count III, he alleges that LCC and NSP Doe medical personnel defendants refused to provide medication to manage his ongoing pain. (*Id.* at 10.) In Count IV, he claims that Doe defendants at NNCC refused to provide necessary psychiatric medication. (*Id.* at 5, 11.) In Count V, he claims that Dr. Snider and Dr. Scott did not provide adequate treatment and refused to submit a surgery request regarding the tendon problem in his hand. (*Id.* at 5-6, 12.)

Plaintiff also alleges First Amendment Retaliation claims in Counts II, III, and IV. (Doc. # 43 at 8-11.) In Count II, he claims that he was denied asthma medication in retaliation for his complaints and grievances seeking asthma medication. (*Id.* at 8-9.) In Count III, Plaintiff alleges that he was refused medication to manage his ongoing pain in retaliation for grievances filed seeking medical treatment. (*Id.* at 10.) In Count IV, he asserts that he was refused psychiatric medication in retaliation for filing kites and his grieving this issue. (*Id.* at 11.)

Defendants filed their Motion for Summary Judgment on May 27, 2011. (Doc. # 58.) Despite being given two extensions of time (*see* Doc. # 63, Doc. # 66), Plaintiff failed to file an opposition.

///

///

2

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R.*

3

*Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id.* Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249-50, 255 (citations omitted).

Finally, the court notes that while Plaintiff failed to oppose the motion despite being given two extensions of time, the Ninth Circuit has instructed that "a verified complaint may

4

1  serve as an affidavit for purposes of summary judgment if it is based on personal knowledge
2  and if it sets forth the requisite facts with specificity." *Moran v. Selig*, 447 F.3d 748, 760 n. 16
3  (9th Cir. 2006) (citing *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc) ("A
4  plaintiff's verified complaint may be considered as an affidavit in opposition to summary
5  judgment it if is based on personal knowledge and sets forth specific facts admissible in
6  evidence.")). Accordingly, even though the plaintiff has failed to submit any opposition to
7  defendants' motion, because he is proceeding pro se, the court must still undertake an analysis
8  of his verified complaint (Doc. #45, p. 12) to ascertain whether any of his assertions create a
9  genuine issue of material fact.

## III. DISCUSSION

**A. Count I**

Count I only states a state law claim for negligence against Castillo. (Doc. # 43 at 5, 7.) While Defendants assert an argument regarding the excessive force claim asserted in the original Complaint, it is clear from the Amended Complaint, and Screening Orders that Plaintiff did not pursue this claim when he filed his amendment. (*See* Doc. # 4, Doc. # 5, Doc. # 42, and Doc. # 43.) To be clear, in the Amended Complaint, Count I only alleges a negligence claim against Castillo. (Doc. # 42, Doc. # 43.)

To state a claim for negligence under Nevada law, a plaintiff must establish: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injuries; and (4) plaintiff suffered damages. *Scialabba v. Brandise Construction Co.*, 921 P.2d 928, 930, 112 Nev. 965, 968 (Nev. 1996) (citation omitted).

Plaintiff's verified Amended Complaint alleges that Castillo was negligent because on August 3, 2008, he failed to perform his function as a correctional officer and make certain that the dangerous gateway was clear of prisoners before closing it. (Doc. # 43 at 3.) Plaintiff asserts that this resulted in injuries to his shoulder, back, and side. (*Id.*) He alleges that Castillo admitted it was his fault that Plaintiff was crushed in the gate. (*Id.*)

In support of their motion, Defendants provide the Declaration of Rudy Castillo. (Doc.

5

# 59-2.) On August 3, 2008, Mr. Castillo was the Unit 10 Control Rom Officer, and his duties at this post included, but were not limited to, controlling all doors within the unit, monitoring radio traffic, reporting counts, and assigning work duties to inmates. (*Id.* at ¶¶ 7-8.) There are four tiers within Unit 10, A through D, and it was his custom and practice to operate the doors to individual tiers in the same way each day. (*Id.* at ¶ 9.) Inmates would enter the rotunda of Unit 10 through the sally port doors which connect the rotunda to the outside. (*Id.*) Once in the rotunda, the inmates would congregate at the door to their assigned tier. (*Id.*) Then, in succession, Mr. Castillo would open the doors for Tier D, Tier A, Tier B, and finally, Tier C. (*Id.*) Once the doors were open, inmates were required to enter the tiers immediately. (*Id.*) Each door would remain open for approximately one (1) minute, which was enough time for all inmates to enter the tier. (*Id.*) Then, in succession, he could close each door to the tiers starting with Tier D, Tier A, Tier B, and finally, Tier C. (*Id.*)

According to Mr. Castillo, this custom and practice was implemented to prevent inmates from getting caught, or pinched, in a closing door, and in particular, the door to Tier D, which was not visible to him from the control room. (Doc. # 59-2 at ¶ 10.) Mr. Castillo provides a diagram he sketched of Unit 10 to provide a visual description of the unit. (*Id.* at ¶ 11, Ex. A.)

On August 3, 2008, Mr. Castillo was operating the Unit 10 doors for inmates returning to the unit. (Doc. # 59-2 at ¶ 12.) The inmates lined up at their tier doors, and pursuant to the custom described above, he opened the Tier D door. (*Id.*) When he did so, Plaintiff emerged from Tier D and walked into the visible section of the main rotunda for Unit 10. (*Id.*) Plaintiff was not authorized to leave Tier D at that time, even though the cell doors in the individual tiers were open. (*Id.*)

Mr. Castillo turned his attention away from Plaintiff to open the doors to Tiers A, B, and C, and by the time he turned his attention back to Plaintiff, he was no longer visible from the control room or the Tier D surveillance camera. (Doc. # 59-2 at ¶ 13.) It was his belief that Plaintiff had returned to his cell in Tier D. (*Id.*) After keeping the doors open for approximately one (1) minute, he started to close the doors to the Unit 10 tiers, starting with Tier D. (*Id.* at ¶ 14.) During the closing sequence, the lights on the control panel for Tier D failed to change

1  from red, for open, to green, for closed, indicating that the Tier D door was ajar. (*Id*.) He did
2  not hear a sound or cry for help, so he did not know why the door was ajar. (*Id*.) He then
3  positioned himself on the top of the control panel and looked at the adjacent window towards
4  the Tier D door, and observed Plaintiff, caught in the closing Tier D door. (*Id*.)

5  Mr. Castillo asserts that upon observing Plaintiff caught in the door, without hesitation,
6  he returned to release the door. (Doc. # 59-2 at ¶ 14.) He asked Plaintiff if he needed medical
7  attention, and Plaintiff responded that he was physically fine and returned to his cell. (*Id*.)

8  Plaintiff's Amended Complaint provides no material factual details regarding this
9  incident, other than the conclusory statement that Castillo intentionally closed the door on
10 him. (*See* Doc. # 43 at 7.) There is no dispute that the door closed on Plaintiff on August 3,
11 2008, but Plaintiff has not provided any evidence to rebut Mr. Castillo's assertion that it was
12 Plaintiff's conduct that day, and not Mr. Castillo's, that caused the unfortunate situation of the
13 door closing on Plaintiff. Accordingly, the court finds that summary judgment should be
14 granted as to Count I.

15 **B. Eighth Amendment claims**

16 The Eighth Amendment prohibits the imposition of cruel and unusual punishment, and
17 "embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency."
18 U.S. Const. amend. VIII; *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal citation and
19 quotations omitted).

20 A prisoner can establish an Eighth Amendment violation arising from deficient medical
21 care if he can prove that prison officials were deliberately indifferent to a serious medical need.
22 *Estelle*, 429 U.S. at 104. A finding of deliberate indifference involves the examination of two
23 elements: "the seriousness of the prisoner's medical need and the nature of the defendant's
24 responses to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on*
25 *other grounds, WMX Tech., Inc. v. Miller*, 104 F.3d. 1133 (9th Cir. 1997). "In deciding
26 whether there has been deliberate indifference to an inmate's serious medical needs, [the court]
27 need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865
28 F.2d 198, 200 (9th Cir. 1989) (citation omitted). "[S]tate prison authorities have wide

7

1  discretion regarding the nature and extent of medical treatment." *Jones v. Johnson*, 781 F.2d
2  769, 771 (9th Cir. 1986). "Budgetary constraints, however, do not justify cruel and unusual
3  punishment." *Id*.

4  "A 'serious' medical need exists if the failure to treat a prisoner's condition could result
5  in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974
6  F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). Examples of conditions that are "serious" in
7  nature include "an injury that a reasonable doctor or patient would find important and worthy
8  of comment or treatment; the presence of a medical condition that significantly affects an
9  individual's daily activities; or the existence of chronic and substantial pain." *Id*. at 1059-60;
10 *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding
11 that inmate whose jaw was broken and mouth was wired shut for several months demonstrated
12 a serious medical need).

13 If the medical needs are serious, Plaintiff must show that Defendants acted with
14 deliberate indifference to those needs. *Estelle*, 429 U.S. at 104. "Deliberate indifference is a
15 high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate
16 indifference entails something more than medical malpractice or even gross negligence. *Id*.
17 Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*,
18 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows
19 of and disregards an excessive risk to inmate health or safety; the official must both be aware
20 of the facts which the inference could be drawn that a substantial risk of serious harm exists,
21 and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also*
22 *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511 U.S. at 858).
23 "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they
24 deny, delay, or intentionally interfere with medical treatment" or the express orders of a
25 prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865
26 F.2d at 201 (internal quotation marks and citation omitted). Where delay in receiving medical
27 treatment is alleged, a prisoner must demonstrate that the delay led to further injury.
28 *McGuckin*, 974 F.2d at 1060; *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407

1  (9th Cir. 1985) (per curiam).

2  In addition, a prison physician is not deliberately indifferent to an inmate's serious
3  medical need when the physician prescribes a different method of treatment than that
4  requested by the inmate. *See McGuckin*, 974 F.2d at 1059 (explaining that negligence in
5  diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth
6  Amendment rights); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (difference of opinion
7  regarding the best course of medical treatment does not amount to deliberate indifference);
8  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (difference of opinion between a
9  prisoner-patient and medical staff regarding treatment is not cognizable under § 1983). To
10 establish that a difference of opinion amounted to deliberate indifference, the inmate "must
11 show that the course of treatment the doctors chose was medically unacceptable under the
12 circumstances" and that the course of treatment was chosen "in conscious disregard of an
13 excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.
14 1996) (citations omitted).

15 In support of their motion, Defendants provide Plaintiff's medical records and a medical
16 history summary prepared by Karen Walsh, NDOC's part-time Health Information Director.
17 (Doc. # 60-2 (Ex. B).)

18 **1. Count II**

19 In Count II, Plaintiff alleges that Dr. Snider, and possibly Doe NNCC medical personnel,
20 denied him his asthma medications at NNCC. (Doc. # 43 at 5, 8-9.)

21 Plaintiff was transferred to NSP on April 28, 2008. (Doc. # 60-2 at ¶ 16.) His medical
22 chart was reviewed and it was noted that he would be scheduled to see a doctor regarding his
23 asthma history. (*Id.*) His medical files had to be sent from California before he could be seen
24 by Dr. Centric. (*Id.* at ¶ 18.)

25 Plaintiff requested an inhaler for the first time on June 1, 2008, and again on June 5,
26 2008. (Doc. # 60-2 at ¶¶ 26, 28.) He received Flovent and Albuterol inhalers on the same date,
27 and again on July 7, 2008, and August 3, 2008. (*Id.* at ¶¶ 29, 43, 65.)

28 Plaintiff requested a refill of his inhalers on August 19, 2008 (Doc. # 60-2 at ¶ 86),

9

which he received on August 26, 2008, and again on September 6, 2008. (*Id.* at ¶¶ 86, 95, 108.)

Next, Plaintiff sent a medical kite for a refill of his inhalers on September 29, 2008, (Doc. # 60-2 at ¶ 138), which he received on October 3, 2008 (*Id.* at ¶ 145). He requested refills again in October, November, and December, 2008. (*Id.* at ¶¶ 161, 183, 224.) There were no subsequent kites indicating that Plaintiff did not receive the refills as requested. Nor are there any records indicating that he requested to be seen regarding this issue during this time period.

On December 16, 2008, Plaintiff kited that his Flovent inhaler was lost when he was transferred from NSP. (Doc. # 60-2 at ¶228.) He requested a refill on his inhalers in January, February, March, April, May, and June, 2009. (*Id.* at ¶¶ 235, 248, 259, 264, 273.)

Finally, Plaintiff was seen regarding his asthma on July 21, 2009, and his inhaler was refilled. (Doc. # 60-2 at ¶ 2, Doc. # 60-6 at 2.)

First, assuming, without deciding, that Plaintiff's asthma is a serious medical need, even if Plaintiff had submitted evidence to establish that there was a delay in getting his asthma medication in October, November, and December of 2008, and January through June of 2009, there is absolutely zero evidence demonstrating that the delay led to further injury. *See*, *McGuckin*, 974 F.2d at 1060; *Shapley*, 766 F.2d at 407. There is no evidence to suggest that Plaintiff suffered any further injury related to the alleged delay in providing him with inhalers. There are no records that he received any treatment for an asthma-related condition that could be attributed to a delay in receiving inhalers. There is simply no evidence to establish that Defendants acted with deliberate indifference toward Plaintiff's medical needs with respect to his asthma medication. He requested refills, and the record before the court indicates that the refills were granted with some regularity. Accordingly, summary judgment should be granted with respect to the Eighth Amendment claim in Count II.

**2. Count III**

In Count III, Plaintiff alleges that LCC and NSP medical personnel refused to provide medication to manage his ongoing pain. (Doc. # 43 at 10.)

10

1      Plaintiff sought medical attention after being caught in the door on August 5, 2008.
2 (Doc. # 60-2 at ¶ 69.) He complained of a bruised left side of his rib cage and left shoulder
3 blade. (*Id*.) He had slight swelling and bruising with a three (3) inch scratch to the skin on the
4 left shoulder blade area. (*Id*.) He was prescribed one (1) tube of analgesic balm and ibuprofen
5 as needed for pain. (*Id*.)

6      On August 7, 2008, Plaintiff sent a medical kite stating that his back and shoulder were
7 still in pain, and the ibuprofen was not helping. (Doc. # 60-2 at ¶ 71.) Plaintiff was seen by
8 Dr. Snider on August 11, 2008. (Doc. # 60-2 at ¶ 77.) Dr. Snider noted that Plaintiff had a full
9 range of motion in his left shoulder, and there was no indication of pain. (*Id*.) He also noted
10 that Plaintiff had slight tenderness over the scapula, but appeared in no distress other than
11 wanting stronger pain medication. (*Id*.) Plaintiff was prescribed Tylenol. (*Id*.)

12      Plaintiff asked for a refill of his Tylenol prescription on September 20, 2008, (Doc. # 60-
13 2 at ¶ 124), and was seen by Dr. Snider on September 22, 2008, and additional Tylenol was
14 prescribed (*Id*. at ¶ 126). In addition, Plaintiff was seen by Dr. Snider again on October 6,
15 2008, seeking analgesic balm for his shoulder pain, which was prescribed. (*Id*. at ¶ 149.)

16      Next, Plaintiff requested a refill of his Tylenol prescription on October 16, 2008. (Doc.
17 #60-2 at ¶ 161.) Plaintiff was examined on October 22, 2008, after he complained that he went
18 to sit down on his bunk and hit his back on the metal bar. (Doc. # 60-2 at ¶ 170.) It was noted
19 that Plaintiff had no swelling, but redness was indicated in the lower spinal area. (*Id*.) Plaintiff
20 was advised to return to the clinic if the problem persisted. (*Id*.) He complained of pain this
21 area again on October 23, 2008. (*Id*. at ¶ 17.) He was examined, and no bruising was noted.
22 (*Id*.)

23      Plaintiff requested a refill of Motrin on November 2, 2008. (Doc. # 60-2 at ¶ 183.)
24 He was seen by Dr. Snider the following day, who noted Plaintiff complained of pain secondary
25 to the October 22, 2008 injury. (*Id*. at ¶ 186.) Analgesic balm was prescribed. (*Id*.) Plaintiff
26 requested refills of the analgesic balm and Motrin on November 24, 2008, and December 8,
27 2008 (*Id*. at ¶ ¶ 209, 224.) He was seen by Dr. Scott on December 22, 2008, and prescribed
28 an ibuprofen pack and analgesic balm. (*Id*. at ¶ 230.)

1    Plaintiff requested another refill of analgesic balm on December 31, 2008. (Doc. # 60-2
2 at ¶ 232.) Then, on January 8, 2009, Plaintiff sent a medical kite stating that he pulled a
3 muscle in his back and was in severe pain (*Id.* at ¶ 237), yet he did not show up for his
4 scheduled appointment on January 13, 2009 (*Id.* at ¶ 238). He requested another refill of his
5 analgesic balm and Motrin on January 15, 2009. (*Id.* at ¶ 239.) He was seen by Dr. Scott on
6 January 20, 2009, and was given a supply of balm and an ibuprofen pack. (*Id.* at ¶ 241.)

7    On January 30, 2009, Plaintiff complained of pain in his chest, shoulder and back
8 related to being smashed in the door. (Doc. # 60-2 at ¶ 244.) He was seen by Dr. Scott on
9 February 3, 2009. (*Id.* at ¶ 246.) X-rays of his chest and scapula were performed, which
10 revealed nothing out of the ordinary. (*Id.* at ¶ 247.)

11    Plaintiff was seen by Dr. Mar on February 13, 2009, regarding the pain in his left
12 scapula. (Doc. # 60-2 at ¶ 250.) Dr. Mar noted Plaintiff had a normal range of motion of the
13 scapula and left shoulder, and no atrophy of the muscles. (*Id.*) His neck also was noted as
14 having a normal range of motion without pain. (*Id.*) Plaintiff was diagnosed with contusions
15 to the left scapula, but with normal strength and range of motion. (*Id.*) He was advised to
16 perform stretching exercises. (*Id.*) He was seen again on February 27, 2009, by Dr. Donnelly,
17 and was given Ben-Gay for his shoulder. (*Id.* at ¶ 252.)

18    Next, Plaintiff complained of severe pain in his shoulder on March 4, 2009. (Doc. # 60-
19 2 at ¶ 254.) He also requested a Tylenol refill on March 5, 2009. (*Id.* at ¶ 255.) Plaintiff was
20 seen by Dr. Scott on March 9, 2009. (*Id.* at ¶ 257.) Cervical spine x-rays were ordered, and
21 he was prescribed ibuprofen and Baclofen, and was ordered to follow up in two (2) weeks for
22 chronic pain management. (*Id.*)The x-rays of Plaintiff's cervical spine revealed cervical
23 spondylosis, particularly at level of C5-C6. (*Id.* at ¶ 261.)

24    Plaintiff requested to be seen to obtain refills of ibuprofen and muscle relaxers on
25 March 19, 2009. (Doc. # 60-2 at ¶ 260.) Plaintiff saw Dr. Scott on March 31, 2009, and
26 reported improvement in his neck pain as a result of the muscle relaxers. (*Id.* at ¶ 263.) He was
27 diagnosed with cervical radiculopathy, and questionable etiology of numbness, and prescribed
28 Elavil and Percogesic. (*Id.*)

1      Plaintiff sent a medical kite indicating that his neck pain was getting worse on April 11,
2 2009. (Doc. # 60-2 at ¶ 266.) He was seen by Dr. Scott on April 14, 2009, who discontinued
3 the Elavil, and started Plaintiff on Baclofen. (*Id.* at ¶ 268.) Plaintiff complained of shoulder
4 pain again on May 2, 2009 (*Id.* at ¶ 270), and was seen by Dr. Donnelly on May 8, 2009 (*Id.*
5 at ¶ 272). Dr. Donnelly diagnosed Plaintiff with mild unresolved pain and discontinued all
6 medications. (*Id.*)

7      The claim that Defendants were deliberately indifferent by refusing to provide
8 medication to manage his ongoing pain is simply belied by Plaintiff's medical records, which
9 are replete with references to evaluations for complaints of pain, as well as prescriptions for
10 pain medication and refills granted upon request. Accordingly, summary judgment should be
11 granted as to the Eighth Amendment claim in Count III.

12     **3. Count IV**

13      In Count IV, Plaintiff claims that Doe defendants at NNCC refused to provide necessary
14 psychiatric medication. (Doc. # 43 at 5, 11.)

15      On April 23, 2008, Plaintiff sent a medical kite to Mr. Ormsby regarding severe
16 depression, nervousness, sweats, shakes, racing thoughts, PTSD, anger, flare-ups, and anxiety.
17 (Doc. # 60-2 at ¶ 14.) He also referenced medications including Seroquel 300mg twice daily,
18 Wellbutrin 150 mg per day, and Buspar 20mg twice daily. (*Id.*) Plaintiff was transferred to NSP
19 on April 28, 2008, and it was noted that psych would be notified of Plaintiff's condition. (*Id.*
20 at ¶ 16.)

21      The medical records note that Plaintiff was given psych medication, including Risperdal,
22 Depakote, Zoloft, and Trazadone on the following dates: May 27 and 30, 2008, June 26, 2008,
23 July 24-31, 2008, August 1-31, 2008, September 1-18 and 22-28, 2008, October 1-31, 2008,
24 November 1-30, 2008, and December 1-9, 2008. (Doc. # 60-2 at ¶¶ 23-25, 37, 48, 49, 51, 52,
25 55, 56, 60, 61, 62-64, 66, 68, 70, 72-75, 78-85, 87-94, 96-107-113, 115-117, 119-123, 127-129,
26 131-135, 137, 139-140, 142-144, 151-160, 162-166, 168-169, 173-182, 184, 187-195, 197-208, 210-
27 223, 225-226.)

28      The court notes that on September 29-30, 2008, and October 1-5, Plaintiff took

Risperdal, but refused to take Zoloft. (Doc. # 60-2 at ¶¶ 139-140.) In addition, it was reported that Plaintiff was caught "cheeking" his medications almost every night at pill call. (*Id.* at ¶ 277.) He also refused his medications on August 1 and 2, 2009. (*Id.* at ¶¶ 289-290.)

There is no indication that Defendants refused to provide necessary psychiatric medication. Rather, Plaintiff's medical records indicate that Plaintiff was regularly provided with psychiatric medication. With no evidence of deliberate indifference, summary judgment should be granted as to the Eighth Amendment claim in Count IV.

**4. Count V**

In Count V, Plaintiff claims that Dr. Snider and Dr. Scott did not provide adequate treatment and refused to submit a surgery request regarding the tendon problem in his hand. (Doc. # 43 at 5-6, 12.)

On June 8, 2008, Plaintiff submitted a medical kite stating that he had a bond or something sticking out of his right palm that was causing him pain. (Doc. # 60-2 at ¶ 30.) Nursing reviewed his chart for transfer on June 12, 2008, and on June 13, 2008, he was received by nursing at NSP. (*Id.* at ¶¶ 31-32.) He submitted another medical kite on June 17, 2008, stating that his right palm had a bone or something protruding up from it causing severe pain, numbness, and cramping. (*Id.* at ¶ 33.) Plaintiff was seen by Dr. Snider on June 23, 2008, who viewed a firm mass on Plaintiff's palm with extensions along the finger, and diagnosed Plaintiff with Dupuytren's contracture (early). (*Id.* at ¶ 35.) Plaintiff was referred to Dr. Mar, and prescribed ibuprofen for pain. (*Id.*)

On June 24, 2008, Plaintiff submitted a medical kite stating that he needed to see a specialist to set up an operation regarding the palmar fibromatosis on his palm. (Doc. # 60-2 at ¶ 36.) Plaintiff was seen by Dr. Mar on July 3, 2008. (*Id.* at ¶ 42.) Dr. Mar noted Plaintiff had a knot in the palm of the fourth digit of his right hand, but had no difficulty gripping with the right hand or moving his fingers. (*Id.*) He further indicated that Plaintiff occasionally experienced numbness when reading, and the knot occasionally became painful, but Plaintiff had no difficulty using his hands, and did not have a job. (*Id.*) Dr. Mar observed Plaintiff had thickness in that region, but there was no swelling or deformity in the hand, and Plaintiff had

1  a normal range of motion and could grip without pain. (*Id*.) He assessed Plaintiff's condition
2  as "thickening of right 4th palmar tendon. No contractures, normal function." (*Id*.) Finally,
3  he advised Plaintiff to keep his right hand active with range of motion exercises and prescribed
4  ibuprofen as needed for pain. (*Id*.)

5  Plaintiff was seen by Dr. Snyder on September 22, 2008, and was prescribed Tylenol.
6  (Doc. # 60-2 at ¶ 126.) A September 24, 2008 medical kite requests a refill of the Motrin
7  prescription for his hand. (*Id*. at ¶ 130.) In a November 24, 2008 medical kite, Plaintiff
8  requests to be seen to have his Motrin prescription refilled, and to have his hand checked
9  because it was getting numb and painful. (*Id*. at ¶ 209.)

10  Plaintiff was seen by Dr. Scott on December 22, 2008, complaining that his hand
11  periodically cramps up and gets numb. (Doc. # 60-2 at ¶ 230.) Plaintiff was prescribed
12  analgesic balm and an ibuprofen pain pack, and was directed to follow up in four (4) weeks.
13  (*Id*.) He requested a refill of his analgesic balm and Motrin on January 15, 2009. (*Id*. at ¶
14  239.)

15  Plaintiff was seen by Dr. Scott again on January 29, 2009, regarding complaints of
16  persistent right hand pain. (Doc. # 60-2 at ¶ 241.) Dr. Scott's impression was that Plaintiff had
17  Dupuytren's contracture, and prescribed Plaintiff a supply of balm and an ibuprofen pack, and
18  referred him to Dr. Mar for a second opinion. (*Id*.)

19  Plaintiff sent a medical kite on January 22, 2009, to schedule an appointing with
20  Dr. Mar regarding his right wrist pain (Doc. # 60-2 at ¶ 243), and was seen by Dr. Mar on
21  February 13, 2009 (Doc. # 60-2 at ¶ 250). Dr. Mar notes that Plaintiff complained of soreness
22  and cramping in his right hand, and that Plaintiff writes a lot. (*Id*.) Dr. Mar further notes that
23  Plaintiff had a normal range of motion of his wrist and fingers, although the palmar on the
24  fourth digit on the right hand was has a thickened ligament in the fourth metacarpal area. (*Id*.)
25  He advised Plaintiff to refrain from typing or writing for one (1) to two (2) weeks, and to
26  perform stretching exercises. (*Id*.)

27  Assuming without deciding that Plaintiff's right hand condition constitutes a serious
28  medical need, the court finds that there is simply no evidence indicating that Dr. Snider or

1  Dr. Scott exercised deliberate indifference towards Plaintiff's medical needs by delaying or
2  withholding necessary medical treatment in connection with the tendon problem in his hand.
3  Instead, the evidence establishes that Plaintiff received responsive and appropriate health care
4  in connection with his hand.

5        Plaintiff has, at best, presented a difference of opinion regarding the best course of
6  treatment for his right hand. A difference of opinion as to how to treat a medical condition does
7  not amount deliberate indifference without a showing that the course of treatment chosen by
8  prison medical personnel was medically unacceptable, and in conscious disregard of an
9  excessive risk to Plaintiff's health. *Jackson*, 90 F.3d at 332. Plaintiff has not made such a
10 showing. Indeed, it is clear from reviewing Plaintiff's medical records that he received
11 appropriate care and treatment for his condition. Prison medical personnel, including
12 Dr. Snider and Dr. Scott, made reasonable and appropriate efforts to address Plaintiff's
13 complaints. He was examined and treated concerning his right hand condition on numerous
14 occasions. In sum, Plaintiff's medical records belie the claim of deliberate indifference.

15       Accordingly, summary judgment should be granted as to the Eighth Amendment claim
16 in Count V.

17 **C. First Amendment retaliation claims**

18       In Count II, Plaintiff claims that he was denied asthma medication in retaliation for his
19 complaints and grievances seeking asthma medication. (Doc. # 43 at 8-9.) In Count III,
20 Plaintiff alleges that he was refused medication to manage his ongoing pain in retaliation for
21 grievances filed seeking medical treatment. (*Id.* at 10.) Finally, in Count IV, he asserts that he
22 was refused psychiatric medication in retaliation for filing kites and his grieving this issue. (*Id.*
23 at 11.)

24       A plaintiff may state a claim for violation of his or her First Amendment rights due to
25 retaliation under 42 U.S.C. § 1983. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such
26 a claim consists of five elements: "(1) An assertion that a state actor took some adverse action
27 against an inmate; (2) because of; (3) that prisoner's protected conduct, and that such action
28 (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citations omitted).

The inmate must (1) submit evidence, either direct or circumstantial, to establish a link between the exercise of constitutional rights and the allegedly retaliatory action, and (2) demonstrate that his or her First Amendment rights were actually chilled by the alleged retaliatory action. *Pratt*, 65 F.3d at 806-07. Timing of the events surrounding the alleged retaliation may constitute circumstantial evidence of retaliatory intent. *See Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989). The Ninth Circuit has recognized that prisoners have a fundamental First Amendment right to file prison grievances and pursue civil rights litigation, and "because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Rhodes*, 408 F.3d at 567 (citation omitted).

The court finds that there is simply no evidence that Defendants took any adverse action because Plaintiff filed medical kites or grievances seeking medical treatment. Plaintiff's mere speculation that this is the case is not enough to raise a genuine issue of material fact. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment") (citation omitted). Nor has Plaintiff submitted circumstantial evidence from which retaliation could be inferred.

Accordingly, summary judgment should be granted as to the First Amendment retaliation claims in Counts II, III, and IV.

### IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING** Defendant's motion for summary judgment (Doc. #59).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within

fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

    2.    That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED: December 9, 2011.

                                               WILLIAM G. COBB
                                               UNITED STATES MAGISTRATE JUDGE